**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-04977

CHRISANNA ELSER, individually and on behalf of all others similarly situated,

Plaintiff,

v.

FLOCK GROUP, INC., d/b/a FLOCK SAFETY, a Delaware corporation;
TOWN OF COLUMBINE VALLEY, COLORADO, a municipality;
TOWN OF BOW MAR, COLORADO, a municipality;
JAMIE MILLIMAN, in his individual capacity; and
BRET COTTRELL, in his individual and official capacities,

Defendants.

---

**CLASS ACTION COMPLAINT AND JURY DEMAND**

---

Plaintiff Chrisanna Elser, by and through her attorneys, Andy McNulty, Mari Newman, and Madeline Leibin of NEWMAN | MCNULTY, respectfully alleges for her Class Action Complaint and Jury Demand as follows:

## INTRODUCTION

1. On September 27, 2025, Sergeant Jamie Milliman of the Columbine Valley Police Department knocked on Chrisanna Elser's front door in Denver with a criminal summons already in his hand. He had never met her, nor had he ever spoken to her. But Defendant Milliman had been digitally stalking Ms. Elser using the Flock Group, Inc. ("Flock") mass surveillance system and cataloging her movements over the past month. Defendant Milliman told Ms. Elser that the neighboring Town of Bow Mar is so thoroughly covered by cameras that no one can enter or leave it without the police knowing, and that those cameras had recorded her driving there about twenty times in the preceding month. He claimed that she had stolen a

package worth twenty-five dollars from a porch, and that her guilt was certain and beyond any doubt. He based this claim on nothing more than a Flock hit showing that her truck had driven through Bow Mar on the day, and near the time, of the theft.

2. When she told him that she was not the thief, he refused to show her the video he claimed proved that she stole the package. He also refused to look at her evidence proving she could not have been the thief. He told her that because she denied the accusation, he would extend her no courtesy. Then he cited her for theft and left.

3. Ms. Elser did not steal anything. The doorbell video of the actual theft, which Defendant Milliman refused to show her, depicts a woman who does not look like her, fled on foot, and never got into a vehicle. Ms. Elser's truck, her phone, and her tailor's security cameras all showed exactly where she was: more than a quarter mile from the theft, being fitted for a gown. But Defendant Milliman refused to look at her evidence. Instead, Ms. Elser was forced to spend the next two weeks proving her own innocence to a police department that would not return her calls. Eventually, the Chief of Police voided her summons, but not before she suffered immensely. Her employer in the financial industry nearly placed her on administrative leave, and she suffered extreme emotional distress after being accused of committing a crime for the first time in her life.

4. Ms. Elser was criminalized because Flock, a private, venture-backed mass surveillance company, has sold the Towns of Columbine Valley and Bow Mar a network of cameras that captures the movements of every vehicle that enters or leaves Bow Mar, twenty-four hours a day, and stores that information in a database that individuals like Defendant Milliman can access with no meaningful guardrails. Ms. Elser was forced to endure the specter of criminal prosecution for weeks because Flock, Bow Mar, and Columbine Valley allowed

officers unrestricted access to the Flock database without requiring a warrant, probable cause, supervisory approval, or any reason whatsoever. Flock, Bow Mar, and Columbine Valley failed to adequately train officers that a hit in the Flock system does not equate to reasonable suspicion, let alone probable cause, that a person has committed a crime.

5. Twelve years before Defendant Milliman accused Ms. Elser of a crime, a previous law enforcement agency fired him for his shoddy investigative work and failure to follow the Constitution. Knowing this, Columbine Valley hired him anyway, and empowered him to use Flock's mass surveillance system without any oversight. Columbine Valley caused the violation of Ms. Elser's rights when it hired, promoted, and empowered Defendant Milliman despite his established history of failing to do basic police work and to respect the rights of those whom he has accused of a crime.

6. Flock's surveillance of Ms. Elser's location and mapping of her entire history of travel by and through the Town of Bow Mar was not unique to her. Flock surveils every Coloradan who drives, bikes, or walks past one of its cameras. It captures photographs of them. It records where they were and when they went there. It keeps that record on its servers, and it makes it searchable by any officer with a login, for any reason, or for no reason at all. Flock operates one of the largest mass surveillance networks in American history, and its cameras have been used to track women who have abortions, monitor protesters, feed data to federal immigration authorities in violation of state law, and stalk former partners. These automated license plate readers ("ALPRs"), which are among the many forms of surveillance technology that Flock sells, have also produced unlawful police action against many Coloradans and Americans.

7. Flock does not invade individuals' privacy merely by photographing and video-recording them. Flock compiles those pictures and videos, and its system, using artificial intelligence, creates a detailed, continuous record of where a person has been and when she was there. Flock provides the ability to pull up the complete history of a person's movements in an instant. It creates a detailed mosaic of the life of every person who passes its cameras, including cataloging when each person goes to her church, medical clinic, union hall, campaign office, lawyer's office, or friend's house. Flock assembles this detailed and comprehensive record of every person who drives past its cameras, whether or not anyone suspects that person of committing any crime, and it hands it to any officer to search with a few keystrokes and no meaningful guardrails. Flock built that system deliberately. It could have limited its system's tracking of each person's movement. It also could have installed restrictions on what information officers can access, required a warrant before officers could access its system, or mandated that officers have at least a case number before searching its system. It willfully refused to do so. It sold the system without these reasonable safeguards for years, including to Columbine Valley and Bow Mar, and it is still selling it (to even more municipalities) to this day.

8. Ms. Elser brings this action to vindicate her rights under the Fourth and Fourteenth Amendments to the United States Constitution, Article II, Section 7 of the Colorado Constitution, and Colorado common law. Ms. Elser brings her claims against Flock on behalf of herself and on behalf of every other Coloradan whose movements Flock has tracked without consent and in an obvious invasion of privacy. She seeks damages for what Defendants did to her, and, on behalf of the Class, damages and injunctive relief for what Flock has done, and continues to do, to every Coloradan it has surveilled. She seeks a declaration that the warrantless

collection, retention, and search of Coloradans' movements through Flock's cameras are unconstitutional, and an injunction that stops Defendants from doing it to anyone else.

## PARTIES

9. Plaintiff Chrisanna Elser is a resident of the City and County of Denver, Colorado. She is a citizen of the United States and of the State of Colorado.

10. Defendant Flock Group, Inc., doing business as Flock Safety, is a corporation with its principal place of business at 1170 Howell Mill Road NW, Suite 210, Atlanta, Georgia 30318. Flock designs, manufactures, owns, installs, maintains, and operates the ALPR cameras in Columbine Valley and Bow Mar, and it owns and operates the cloud servers and software through which Defendants Milliman and Cottrell surveilled and searched Ms. Elser's movements. Flock transacts business in Colorado, has installed cameras on Colorado's streets, and employs sales, customer success, and government affairs personnel who solicit Colorado governments and train Colorado peace officers. Flock is a willful participant in joint activity with Columbine Valley, Bow Mar, and their officers and, as described below, acted under color of state law with respect to the surveillance and searches of Ms. Elser's movements.

11. Defendant Town of Columbine Valley, Colorado ("Columbine Valley") is a Colorado municipal corporation and a statutory town. Columbine Valley operates the Columbine Valley Police Department ("CVPD"), which provides police services to Columbine Valley and, by contract, to the Town of Bow Mar. Columbine Valley is the contracting party on the Flock agreements described in this Complaint. At all times relevant to this Complaint, Columbine Valley employed Defendants Milliman and Cottrell, and was responsible for their hiring, training, supervision, and discipline, and for the policies, customs, and practices of CVPD.

12. Defendant Town of Bow Mar, Colorado ("Bow Mar") is a Colorado municipal corporation and a statutory town. Bow Mar contracts with Columbine Valley and pays it more than $300,000 per year for police and court services, and CVPD polices Bow Mar under Bow Mar's authority and on Bow Mar's behalf. The six Flock cameras that photographed Ms. Elser are installed in Bow Mar, and Bow Mar authorized, funded, and approved the installation and operation of Flock's cameras in Bow Mar.

13. Defendant Jamie Milliman is a resident of Colorado. At all times relevant to this Complaint, Defendant Milliman was a sergeant with CVPD, a peace officer as defined by C.R.S. § 16-2.5-102 and C.R.S. § 24-31-901(3), and was acting within the scope of his official duties and employment and under color of state law.

14. Defendant Bret Cottrell is a resident of Colorado. At all times relevant to this Complaint, Defendant Cottrell was the Chief of Police of CVPD, a peace officer as defined by C.R.S. § 16-2.5-102 and C.R.S. § 24-31-901(3), and was acting within the scope of his official duties and employment and under color of state law. Defendant Cottrell signed Columbine Valley's contracts with Flock, selected the locations of the Flock cameras in collaboration with Flock, served as the administrator of CVPD's Flock account, authorized Flock to share CVPD's camera data with law enforcement agencies throughout Colorado, hired and supervised Defendant Milliman, and was the final policymaker for CVPD on the use of Flock's surveillance system.

## **JURISDICTION AND VENUE**

15. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

16. This Court has supplemental jurisdiction over Plaintiff's claims arising under the Colorado Constitution and Colorado law pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's federal claims.

17. This Court also has original jurisdiction over Plaintiff's claims related to Flock pursuant to 28 U.S.C. § 1332.

18. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988 and C.R.S. § 13-21-131(3).

19. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, Plaintiff and all of the individual and municipal Defendants reside in the State of Colorado, and Defendant Flock operates in the State of Colorado.

## FACTUAL ALLEGATIONS

**Flock has built a mass surveillance network that catalogs and tracks the exact movements of every person who travels past its cameras and other mass surveillance devices.**

20. Flock is a private, venture-backed technology company that designs, manufactures, installs, owns, and operates ALPRs and other surveillance technology, along with the cloud-based artificial-intelligence-powered software platform that stores, compiles, analyzes, and searches the data those cameras, and other surveillance technology devices, collect. Flock markets its product to law enforcement agencies, homeowners' associations, businesses, and schools.

21. Flock mounts its ALPR cameras on poles at fixed locations along public roads. They automatically capture an image of every person, vehicle, and bicycle that passes, read vehicles' license plates, and record the date, time, and location of every individual who travels

near Flock's ALPR cameras. Flock's proprietary vehicle fingerprint technology uses machine learning to catalog each vehicle's type, make, color, state of registration, and distinguishing features such as decals, bumper stickers, roof racks, bike racks, and missing or covered plates. Flock has also applied this technology to individuals and bicycles that pass by its ALPR cameras, tracking their locations, race, clothing, and other distinguishing features.

22. Flock's cameras are not marked with signage. They provide no notice telling a passing driver that her vehicle is being captured, cataloged, and stored. A person who drives past one of Flock's cameras has no way to learn that it exists, that it recorded her, or that a private company now holds a comprehensive record that tracks her every movement.

23. Flock uploads every image its ALPR cameras capture to its servers and stores it there. Flock's software allows any authorized user to type in a license plate and retrieve every time and place that any camera in the user's network photographed that plate during the retention period. Flock markets this feature to police as a license plate lookup tool that returns a license plate's location history. In reality, it creates a detailed mosaic of each individual's movements that is searchable by law enforcement or anyone else with access to the Flock network.

24. Flock does not confine its network to a single town. Flock's platform allows each agency to opt into a statewide and nationwide network, so that an officer in one town can search the cameras of thousands of other agencies. For example, Flock's contract with Columbine Valley allowed access to more than one billion additional plate reads each month through Flock's one-to-one, statewide, and national search networks.

25. Flock's marketing materials describe the result as a panoramic view of the customer's jurisdiction, and they tell police that Flock's system turns unbiased data into objective answers about a person's movements.

26. No one can avoid Flock's cameras and still live an ordinary life. Flock mounts its cameras on the public roads that people must travel to reach their homes, workplaces, schools, doctors, houses of worship, families, and friends. For example, Ms. Elser could not have avoided Bow Mar's cameras except by abandoning the route between her home and the businesses she patronized.

27. The overwhelming majority of the people whose movements Flock tracks are not suspected of committing any crime. Flock's cameras track everyone who passes them, all of the time, without distinguishing between criminals and innocent civilians. The people in its database have no warrant, no charge, no case number, and no connection to any investigation. They are in the database because they drove down a street. Flock keeps a detailed history of their exact movements in its database, ready to be retrieved, for as long as the agency that bought the cameras chooses to keep them.

28. Flock's system requires no warrant before an officer searches its system, nor does it require probable cause or reasonable suspicion. Flock's system does not require supervisor approval for searches and, for most of the time relevant to this Complaint, it required no case number and no explanation at all. An officer with a login and a license plate can retrieve a month of a stranger's life in the time it takes to type a few words into Flock's system.

29. Notably, this is surveillance that no government could have conducted by itself. For example, a police department that wanted to know everywhere Ms. Elser drove for a month would have had to assign officers to follow her, around the clock, for thirty days. This would have required a warrant and a significant outlay of resources. Instead, the Flock system accomplishes this same outcome with a few search terms and the click of a mouse.

**Columbine Valley was Flock's first Colorado customer, and Flock spent years cultivating Defendants Cottrell and Milliman as power users of its system.**

30. Flock's relationship with Columbine Valley began in early 2020. On March 10, 2020, Flock's founder and chief executive officer personally emailed Defendant Cottrell to tell him that Flock would add the cameras of a local homeowners' association to CVPD's network and doing so would give CVPD around-the-clock access to those cameras. He also told Defendant Cottrell that Flock would continue to do the same with other homeowners' associations in the area and expand its network in that way.

31. By August 2020, Flock was already operating a camera network inside Bow Mar. Flock's General Manager for the West wrote to Defendant Cottrell to check on the Flock system in Bow Mar and offered to set CVPD up with features that were not available to private citizens, including hot list alerts.

32. In October 2020, Flock sent Defendant Cottrell a Memorandum of Understanding that governed CVPD's access to the Bow Mar cameras and any others that came online from local homeowners' associations. Flock copied Bow Mar's mayor on that email. Flock explained that most of CVPD's officers were then users of Bow Mar's private camera network and therefore could not see Flock's law enforcement tools, and that Flock needed to move all of the users into a CVPD organization so that they would have access to more networks and cameras, and additional features that would allow CVPD to surveil everyone who entered or passed near Bow Mar.

33. On November 18, 2020, Flock trained CVPD on its system. Two CVPD officers attended: Defendant Cottrell and Defendant Milliman. At Defendant Cottrell's direction, Flock also made Defendant Milliman an administrator of CVPD's account.

34. Flock then contracted with Columbine Valley to install cameras throughout that town. Before the Board of Trustees meeting at which the Board would vote on the Flock

contract, a Flock territory manager provided Defendant Cottrell with a presentation and strategized with him on how to convince the Board to approve the Flock contract. The presentation Flock prepared for Columbine Valley's Board of Trustees on March 16, 2021, promised a sixty percent reduction in crime within six months. It told the Board that Flock's cameras detect unbiased and objective data that its officers could use to target and arrest individuals. At the meeting, Columbine Valley provisionally approved the use of seven Flock cameras.

35. When Defendant Cottrell went on leave for a period in May 2021, he told Flock that Defendant Milliman would be Flock's point of contact at CVPD in his absence. Defendant Milliman met in person with Flock's regional sales director and market manager.

36. On June 23, 2021, Columbine Valley's mayor officially signed a contract with Flock. Flock installed seven cameras in Columbine Valley, including at Brookhaven Lane, Coal Mine Avenue, Fairway Lane, Hunter Run Lane, Middlefield Road, Village Court, and Wilder Lane. Flock also upgraded the six cameras in Bow Mar.

37. Bow Mar's elected officials personally participated in Flock's marketing. In July 2021, Flock asked Bow Mar's mayor and Defendant Cottrell if they would provide quotations for a Flock press release announcing a new round of venture funding, telling them that Flock had thought of them because they had gotten Flock started in the Colorado market. Flock drafted a quotation for Bow Mar's mayor in which he praised Flock for keeping Bow Mar's residents safe and looked forward to extending the partnership, and Bow Mar's mayor approved it for publication.

38. Flock also used Columbine Valley to expand its network. In October 2021, Flock, with Defendant Cottrell's approval, gave another sheriff's office access to CVPD's cameras. In

November 2021, Flock granted access to CVPD's cameras to all current police department customers of Flock in Colorado. Flock and Defendant Cottrell allowed every police department in Colorado that contracted with Flock (present and future) to track the exact location of every driver who passes through Bow Mar and Columbine Valley, including Ms. Elser, with no notice to the public and no meaningful oversight.

39. Flock continued to provide new surveillance features to CVPD. Flock provided CVPD with an advanced search package, including a visual search tool that could take images from residents' home security cameras and run them through Flock's system to find matching vehicles, a convoy search tool that could identify other vehicles seen traveling with a suspect vehicle, and a multi-location search tool that could cross-reference license plate reads from two different areas to identify vehicles present in both.

**Chrisanna Elser is a financial planning quality assurance specialist who has lived quietly near Bow Mar for years.**

40. Ms. Elser lives with her husband in the Fort Logan neighborhood of southwest Denver, in a home that sits roughly fifty feet north of the municipal boundary with Bow Mar.

41. Ms. Elser's livelihood depends on her reputation for integrity. She works for a financial institution in an industry in which an accusation of theft can end a career.

42. Before September 27, 2025, Ms. Elser had never been accused of a crime. She had spent five years building a home and a life in a neighborhood that rarely sees police activity.

43. Bow Mar is a small, affluent town of roughly 850 residents wedged between Denver, Littleton, and Columbine Valley. Its residential streets connect Sheridan Boulevard to the neighborhoods to the west and south, and Denver residents like Ms. Elser drive through or adjacent to Bow Mar routinely to reach shops, services, and their homes.

**A Flock camera constantly surveils every road into Bow Mar.**

44. Bow Mar has three vehicular entrances. Flock covers all three with six cameras: inbound and outbound on Sheridan Boulevard, inbound and outbound on West Belleview Avenue, and inbound and outbound on Berry Avenue. As a result, no person can drive into Bow Mar, drive through Bow Mar, or drive out of Bow Mar without being captured by Flock's ALPR cameras.

45. Flock also operates a camera network inside Bow Mar for a local homeowners' association, to which CVPD, Defendant Cottrell, and Defendant Milliman have around-the-clock access.

46. As a result, Bow Mar, CVPD, and Flock catalog Ms. Elser's, and everyone else's, every movement each time they drive through or adjacent to the town.

**Defendant Milliman used Flock's database to wrongly accuse Ms. Elser of stealing a twenty-five-dollar package.**

47. On Monday, September 22, 2025, shortly before noon, someone took a package from the front porch of a home on Ridge Trail in Bow Mar. The package was valued at twenty-five dollars or less.

48. The homeowner's doorbell camera recorded the theft. The video depicts a young woman who walks up to the front door, takes the package, and runs away on foot. The video does not depict the woman getting into any vehicle, nor does it depict a Rivian or any other truck.

49. CVPD assigned Defendant Milliman to investigate the theft. He did not canvass the neighborhood for witnesses, nor did he identify the woman in the video. He did not determine whether she lived nearby, worked nearby, or had fled to a waiting vehicle.

50. Instead, Defendant Milliman logged into Flock's system and searched it. Upon information and belief, without a warrant, probable cause, reasonable suspicion as to any particular vehicle, supervisory approval, or any legitimate basis to believe that a vehicle had been involved in the theft at all, Defendant Milliman queried Flock's database for every vehicle that Bow Mar's Flock cameras had captured driving near the home where the package was stolen and in the time frame surrounding the theft.

51. Flock's cameras returned photographs of Ms. Elser's forest green Rivian truck. Flock's ALPR cameras captured her truck entering Bow Mar at approximately 11:52 a.m. and leaving at approximately 12:09 p.m. from the Bow Mar entrance on Sheridan Boulevard.

52. The photographs showed exactly what Ms. Elser had done: she drove into Bow Mar on Sheridan Boulevard and, roughly seventeen minutes later, she drove back out. They did not show her truck on Ridge Trail or stopping anywhere nearby. They did not show her, or anyone, taking a package. The photographs did not show who was driving the vehicle, and Defendant Milliman had no evidence showing that Ms. Elser was the driver of the vehicle.

53. Defendant Milliman did not stop there. Having identified Ms. Elser's license plate, he searched Flock's database for the historical movements of her truck to surveil her every movement by and through Bow Mar over the past month. Flock's system told him that Ms. Elser's truck had passed Bow Mar's cameras approximately twenty times in the preceding month. Defendant Milliman would later recite that figure to Ms. Elser's face as proof of how much he knew about her.

54. Flock designed a system that converts ordinary, lawful, repeated travel into the appearance of guilt. Ms. Elser drove through Bow Mar roughly twenty times in a month because

her route took her through Bow Mar. Flock's system served that fact to an officer as proof that Ms. Elser had committed a crime.

55. Defendant Milliman's search of Ms. Elser's movements over the preceding month had nothing to do with the theft of a package on September 22, 2025. A package thief's prior travel history is not evidence that she stole a package on a particular day. Defendant Milliman ran the search because Flock's system let him, no policy of Columbine Valley or Bow Mar forbade it, and Flock had trained him to do so.

56. Upon information and belief, Defendant Milliman also used Flock's system to look up the registered owner of the truck and to determine where Ms. Elser lived. Her home is in the City and County of Denver, outside the jurisdiction of Columbine Valley and Bow Mar.

57. Without conducting any further investigation, and without reasonable suspicion (let alone probable cause) that Ms. Elser had committed the theft, Defendant Milliman decided to issue Ms. Elser a criminal citation for theft.

**Defendant Milliman arrived at Ms. Elser's door with a criminal summons in hand and refused to look at the evidence that would have exonerated her.**

58. On the afternoon of Saturday, September 27, 2025, Defendant Milliman drove to Ms. Elser's home in Denver. He wore his CVPD uniform and drove a marked CVPD vehicle, which he parked directly in front of Ms. Elser's neighbor's home.

59. When Defendant Milliman knocked on the door, Ms. Elser's husband answered. Defendant Milliman asked to speak with Ms. Elser, and she came to the door. Defendant Milliman began by telling Ms. Elser that she knew why he was there. Ms. Elser told him that she did not.

60. Defendant Milliman then told Ms. Elser that Bow Mar has cameras and that no one can enter or leave the town without the police knowing it. He told her, by way of example, that she had driven into Bow Mar about twenty times in the preceding month.

61. Defendant Milliman showed Ms. Elser still images from the Flock system of her truck entering and leaving Bow Mar. He told her that she had stolen a package from a porch in Bow Mar on the Tuesday of that week, and that he had video from the victim's doorbell camera showing her ringing the doorbell, grabbing the package, and running away.

62. The theft did not occur on Tuesday. It occurred on Monday, September 22. On Tuesday, September 23, Ms. Elser's truck was parked at her husband's office in the Denver Tech Center (as he had driven it to work that day), and she was at home working.

63. Ms. Elser told Defendant Milliman that she works from home and had been home that day. Defendant Milliman responded that she was not at home, but was stealing a package in Bow Mar.

64. Ms. Elser asked to see the video, for the date of the alleged crime, and to be told the address where it occurred. She explained that she needed to see those details to understand what he was accusing her of and so that she could respond accurately.

65. Defendant Milliman refused. He told her that she could see the video if she went to court. He told her that because she was going to deny the accusation, he would not extend her any courtesy. He repeated that refusal, in different words, throughout the encounter, insisting that she was lying to him.

66. Ms. Elser then offered to show Defendant Milliman evidence that would definitively prove that she did not take the package. She told him that her truck has cameras and that she could show him exactly where she had been on the day in question. Her Rivian is

equipped with multiple onboard cameras that record continuously while it is driven, and she could show him the recordings.

67. Defendant Milliman refused to look at these recordings. He told her that he already knew she stole the package, and that she could bring her video to court if she wanted to.

68. Defendant Milliman told Ms. Elser that he understood the accusation came as a shock to her but that the case against her was a lock, one hundred percent certain, with no doubt whatsoever. He said that he would not have come to her home unless he was completely sure, that the theft was on video, and that she was welcome to go to court. He based his conclusion that Ms. Elser had stolen the package solely on his use of the Flock system.

69. Defendant Milliman never asked Ms. Elser where she had gone on September 22, whether she had an appointment in the area, or whether anyone could confirm her whereabouts. He never asked to see her truck's cameras, her phone, or anything else. He showed up to her door to deliver a criminal citation, not to investigate.

70. Defendant Milliman then handed Ms. Elser a criminal summons and complaint charging her with theft and requiring her to appear in Jefferson County court in December 2025.

71. The encounter took place on Ms. Elser's front porch, in broad daylight. Defendant Milliman raised his voice at Ms. Elser throughout the encounter. He parked his marked police vehicle outside her neighbor's house. Two of Ms. Elser's neighbors drove past and observed it. A third neighbor, two doors down, was on her porch and heard the raised voices. By that evening, her neighbors knew that a police officer had come to her door and accused her of a crime.

72. Ms. Elser had a reasonable expectation of privacy in the whole of her physical movements that Columbine Valley, Bow Mar, Flock, and Defendant Milliman tracked.

Columbine Valley, Bow Mar, Flock, and Defendant Milliman searched Ms. Elser when they retrieved a record of her past movements from the Flock database for the preceding month.

**Ms. Elser spent the next two weeks trying to prove her innocence, but Defendants ignored her.**

73. After Defendant Milliman left, Ms. Elser called the Denver Police Department. She asked that a Denver officer come to her home so that she could report what had happened and speak to someone. The Denver Police Department referred her back to Defendant Milliman.

74. On the afternoon of September 27, Ms. Elser and her husband spoke with Defendant Milliman by telephone.

75. During the call, Defendant Milliman described the clothing he claimed Ms. Elser had worn during the theft. He also stated that he could pull the GPS records for her Rivian.

76. Ms. Elser told him to do exactly that. Her truck's GPS records would have shown, to the second, that she had driven to her tailor and back and had never stopped on Ridge Trail.

77. Ms. Elser asked to speak to a supervisor. Defendant Milliman refused to put her in touch with one.

78. Ms. Elser and her husband spent the rest of that Saturday and the days that followed gathering evidence that she had not stolen the package: the recordings from her truck's cameras, the location history from her phone, the footage from her home security cameras, and the security camera images from her tailor's home.

79. Beginning the Monday after Defendant Milliman cited her, Ms. Elser and her husband tried to reach anyone at Columbine Valley or Bow Mar who would look at the evidence they had compiled that definitively proved her innocence.

80. On September 29, 2025, Ms. Elser's husband left a message for Defendant Cottrell. Defendant Cottrell did not call back.

81. On September 30, 2025, Ms. Elser left a message for Defendant Cottrell with CVPD dispatch. Defendant Cottrell did not call back.

82. On October 1, 2025, Ms. Elser left a message for Defendant Cottrell. Defendant Cottrell did not call back.

83. On October 2, 2025, Ms. Elser left a message for Defendant Cottrell. Defendant Cottrell did not call back.

84. On October 3, 2025, Ms. Elser left a message for Defendant Cottrell. Defendant Cottrell did not call back.

85. Ms. Elser also looked for anyone else with the authority to vacate her criminal citation.

86. On October 6, 2025, Ms. Elser emailed Bow Mar's mayor, Bryan Sperry, requesting a meeting. Then, she called Jefferson County Sheriff's Office Internal Affairs, which told her that it had no authority over Columbine Valley and directed her to J.D. McCrumb, the Town Administrator for Columbine Valley. Immediately, she left a message for Mr. McCrumb.

87. On October 7, 2025, Mr. McCrumb returned Ms. Elser's call. He did not offer to review her evidence. He told her that she needed to speak with Bow Mar's Town Clerk, Susan Blair, who would connect her with the right person. He mentioned that the matter had been escalated to the Town Attorney. Ms. Elser left a message for Ms. Blair. That evening, Mayor Sperry left Ms. Elser a message stating that a man named Chris Mease would call her the following day. Ms. Elser called Mayor Sperry back and spoke with him. He did not offer to review her evidence. He told her, in substance, that she would have to trust the legal process and go to court to prove her innocence.

88. In all, Ms. Elser and her husband contacted Columbine Valley and Bow Mar officials a dozen times over nine days. Not one of them agreed to look at the evidence she had compiled.

89. Tellingly, while Columbine Valley was ignoring Ms. Elser's calls, it was asking the public to help it find some evidence that she had stolen the package. On October 7, 2025, CVPD posted a notice on the Nextdoor social network under a heading identifying the subject as a porch pirate. The post asked residents in the area of Yellowstone Street and Ridge Trail to check their video footage for September 22 between 11:50 a.m. and 12:10 p.m., stated that CVPD was looking for a suspect vehicle described as a dark green Rivian truck, and asked anyone with video placing the vehicle in the area during that time frame to contact CVPD. Ten days after Defendant Milliman told Ms. Elser that her guilt was certain and beyond doubt, CVPD was soliciting the public for any video placing her truck in the area. Columbine Valley had no such video. It never did. Ms. Elser only learned of the post from a friend.

**Ms. Elser was clearly innocent.**

90. The onboard cameras and GPS in Ms. Elser's Rivian had recorded her entire drive on September 22, 2025. Those records show her leaving her home at 11:51 a.m., driving south on Sheridan Boulevard, turning onto West Tufts Avenue, and arriving at her tailor's shop at 11:53 a.m. They show her truck parked in the tailor's driveway while she was inside for a gown fitting. They show her leaving at 12:06 p.m., driving west on Tufts Avenue and north on Sheridan Boulevard, and arriving home at 12:08 p.m. The video and GPS show that she never stopped anywhere else and never turned onto Ridge Trail.

91. Her phone's location history independently recorded the same trip: she left home at approximately 11:45 a.m., drove for approximately eight minutes, arrived at her tailor's shop

at approximately 11:53 a.m., stayed until approximately 12:04 p.m., drove for approximately six minutes, and arrived home at approximately 12:10 p.m.

92. Her tailor's security cameras photographed her arriving at approximately 11:54 a.m. and leaving at approximately 12:08 p.m., wearing a light pink top, black pants, and an olive green fleece. Her tailor confirmed her noon appointment.

93. Her home security cameras recorded her truck leaving and returning.

94. The tailor's shop is more than a quarter mile from the home on Ridge Trail where the package was stolen. During the window in which the doorbell camera recorded the thief taking the package, Ms. Elser's tailor was fitting her for a gown for a charity event.

95. Ms. Elser also found the victim's doorbell footage that Defendant Milliman would not show her. Video of the theft had been posted publicly on Nextdoor. Ms. Elser watched it. The woman in the video does not resemble her. She is noticeably younger. Her hair, clothing, footwear, and profile are different.

96. Every source of evidence available to Defendant Milliman on September 27, 2025, demonstrated that Ms. Elser had never been near the location where the package was stolen, let alone stolen the package.

**Defendant Cottrell voided the summons with a three-sentence email and never apologized.**

97. On Saturday, October 11, 2025, at 7:53 p.m., having been unable to reach anyone by phone, Ms. Elser emailed Defendant Cottrell and Defendant Milliman a written timeline of her movements on September 22, links to her truck's recordings, her phone's location history, the tailor's security camera photographs, a map of her route, and a photograph of the outfit she had worn.

98. In that email, Ms. Elser pointed Defendants to their own evidence. She wrote that additional verification of her route was available from the Flock cameras at the entrance to Bow Mar and at the intersection of Tufts Avenue and Sheridan Boulevard. Flock's own cameras showed a seventeen-minute round trip consistent only with a brief errand. Defendants possessed that evidence the entire time.

99. Four days later, on Wednesday, October 15, 2025, at 6:55 a.m., Defendant Cottrell replied and voided the summons. He has never acknowledged that his department ignored her calls for two weeks, nor has he told her what Columbine Valley would do to ensure that it never happened again.

100. No one from Columbine Valley or Bow Mar has ever apologized to Ms. Elser.

**Columbine Valley ratified Defendant Milliman's conduct and disciplined him only for being rude to Ms. Elser.**

101. Ms. Elser's story became public in late October 2025, when Denver news organizations published the footage from her doorbell camera. It went viral, spreading internationally.

102. Columbine Valley responded by first going dark and deactivating CVPD's social media accounts.

103. Then, Columbine Valley affirmatively defended Defendant Milliman. On November 11, 2025, Mr. McCrumb issued a written statement on behalf of Columbine Valley. In it, Columbine Valley asserted that Defendant Milliman, using the evidence and information available to him at the time, had a reasonable belief in issuing the summons, and that exculpatory evidence was not submitted to the department for review until approximately two weeks later, at which point the department decided to drop the charge.

104. That statement was false in two respects, and Columbine Valley knew it. First, the evidence and information available to Defendant Milliman on September 27 included Flock's own photographs showing Ms. Elser's truck driving straight through Bow Mar, a doorbell video showing a thief who looked nothing like Ms. Elser and who had fled on foot, and Ms. Elser's offer to show him her truck's cameras and GPS data. No reasonable officer could have believed that there was probable cause to charge Ms. Elser with a crime when Defendant Milliman came to her front door on September 27, 2025. Second, the exculpatory evidence was not submitted two weeks later because Ms. Elser withheld it. It was submitted two weeks later because Defendant Milliman refused to look at it on September 27, and because Defendant Cottrell and Mr. McCrumb refused to return her calls for the following ten days.

105. Mr. McCrumb's statement went on to say that Columbine Valley had reviewed the event, had taken steps to assure that its officers continue to use their best judgment in interacting with the public, and had decided that appropriate disciplinary action would be applied to the officer involved.

106. Through that statement, Columbine Valley's Town Administrator, speaking for the Town, reviewed Defendant Milliman's decision to search Flock's database for Ms. Elser's movements and to charge her with theft, and ratified it. That statement was the official position of Columbine Valley.

107. On November 11, 2025, Defendant Cottrell wrote to Defendant Milliman that his demeanor during the incident had been unprofessional and inconsistent with the standards expected of a sworn officer of the department. The letter faulted Defendant Milliman for rude behavior, a dismissive attitude, and an unwillingness to de-escalate. It stated that such behavior undermines public trust, harms team morale, and does not reflect the department's values of

integrity, respect, and professionalism. It directed Defendant Milliman to complete training in community relations, de-escalation techniques, and interview and interrogation skills within thirty days. Columbine Valley did not base the discipline on Defendant Milliman's misuse of the Flock system, failure to have probable cause for Ms. Elser's citation, clearly deficient investigation, refusal to consider exculpatory evidence, or decision to charge Ms. Elser with a crime based solely on photographs showing that her vehicle was simply in the neighborhood (but not on the same street) around the same time that the theft had taken place. Upon information and belief, Defendant Milliman retains his employment with Columbine Valley, his rank, and his unrestricted access to Flock's system to this day.

108. Two days later, when a news organization reported that the Jefferson County Sheriff's Office had fired Defendant Milliman for misconduct, Columbine Valley doubled down. Mr. McCrumb's statement declared that Defendant Milliman had an exemplary track record during his eleven years at Columbine Valley, that the Town had taken prompt action and administered proportional discipline and retraining, and that the Town was ready to move forward.

**Columbine Valley hired Defendant Milliman despite knowing that the Jefferson County Sheriff's Office fired him for failing to do basic investigative police work and violating a citizen's rights.**

109. Before Columbine Valley hired him, Defendant Milliman was a deputy with the Jefferson County Sheriff's Office.

110. In December 2012, the Jefferson County Sheriff's Office opened an internal investigation into Defendant Milliman for failing to follow through with his official duties. The Sheriff's Office placed him on leave in February 2013 and terminated his employment in April 2013.

111. In a 2013 letter, the division chief of the patrol division informed Defendant Milliman that he had failed to take reports from citizens as required by policy, had failed to advise a juvenile suspect of her rights before questioning her, and had failed to complete required paperwork and documentation in the Sheriff's Office's computer-aided dispatch system.

112. Columbine Valley hired Defendant Milliman roughly one year after the Jefferson County Sheriff's Office fired him, and later promoted him to sergeant.

113. Columbine Valley knew about the firing when it hired him. After the events described in this Complaint became public, Mr. McCrumb admitted on Columbine Valley's behalf that the Town had considered Defendant Milliman's work history and his termination from Jefferson County, and had hired him anyway.

114. When a news organization requested Columbine Valley's records concerning Defendant Milliman's hiring in November 2025, Mr. McCrumb responded that the Town could not locate any documents related to his hiring.

**Columbine Valley and Bow Mar deployed Flock's mass surveillance dragnet with no meaningful limits on how their officers used it.**

115. At all times relevant to this Complaint, Columbine Valley and Bow Mar operated Flock's cameras without any requirement that an officer obtain a warrant, establish probable cause, articulate reasonable suspicion, obtain supervisory approval, or document a case number before searching the location history of any vehicle.

116. Upon information and belief, Columbine Valley had no written policy governing officers' access to or use of Flock data at the time Defendant Milliman searched Ms. Elser's movements, no limit on the number of searches an officer could run, no requirement that searches be tied to an open case, no routine audit of officers' searches, and no training on the evidentiary limits of the Flock system.

117. Defendant Cottrell, the department's Flock administrator and a Flock-designated power user, set that policy. He gave Defendant Milliman unrestricted access to a database that records the movements of every person who travels into, out of, or adjacent to Bow Mar, and to the statewide and nationwide network of Flock cameras beyond.

118. Bow Mar, for its part, treats Flock's cameras as a general-purpose tool of municipal government. Upon information and belief, in the fall of 2025, at the same time Defendant Milliman was using Bow Mar's cameras to accuse Ms. Elser of theft, Bow Mar was using data from the same cameras to surveil every vehicle passing through town for a traffic study that Bow Mar has since used to justify gating its public streets against non-residents.

119. Neither Columbine Valley nor Bow Mar, nor any of their officials, has ever sought a warrant to photograph, catalog, store, share, or search the movements of the people who drive through their streets. Neither town has ever asked a judge to find probable cause, or even reasonable suspicion, before an officer reconstructs a month of a citizen's travels with a few keystrokes.

**Flock built a mass surveillance system that violates the basic right of privacy of every person it captures.**

120. Flock advertises to the public through its promotional materials that its cameras photograph cars rather than people, that they capture a single moment rather than a person's movements, and that they perform no facial recognition, no predictive policing, and no demographic profiling. However, Flock's system does each of these things. Flock falsely advertises its system's capabilities to the public.

121. Flock's patent makes clear that Flock surveils people, uses facial recognition and predictive policing technology, and profiles individuals based on their demographics. On October 4, 2020, Flock applied for a United States patent titled System and Method for Object

Based Query of Video Content Captured by a Dynamic Surveillance Network. The named inventors are Garrett Langley, Flock's co-founder and chief executive officer, and Matt Feury. The United States Patent and Trademark Office granted the application on August 16, 2022, as United States Patent Number 11,416,545. The patent describes a neural network configured to identify different classes of people by sex and by race. It describes a second neural network for gauging a person's height and weight. It describes a third for identifying the type of clothing a person is wearing. It describes the composite output those networks produce, which is a description of a particular human being by sex, by clothing, and by approximate height and weight. It describes the ability to query the system for footage containing a person matching stored face recognition data points. And it describes the ability to compare an object's stored characteristics against every other camera's footage to recognize the same object again somewhere else. Flock's own patent calls the architecture a dynamic surveillance network.

122. Flock engineered its hardware to create a detailed mosaic of the lives of the individuals it records. Because Flock catalogs far more than a plate number, Flock's network can find and follow a vehicle even when its plate is unreadable, obscured, or never captured at all. Flock markets the ability to investigate using vehicle descriptions alone.

123. In September 2026, researchers examined the software extracted from a physically recovered Flock camera. The software explicitly detects people, bicycles, and license plates. It isolates bumper stickers and other graphics. It produces dozens of images of a single passing vehicle. Over several weeks of recovered logs, the researchers found that one camera generated more than one million images.

124. Flock sells software tools, including:

a. a tool that lets an officer type a description of a human being in plain language and receive video of the people who match it. Flock calls it a unified video and plate reader search interface. Officers across the country have run that search hundreds of times to find people rather than vehicles.

b. a tool that identifies which other vehicles Flock's cameras repeatedly photographed near a target vehicle and reports them as linked. That tool does not find cars. It maps who a person travels with. It infers relationships from driving patterns.

c. a tool that flags a vehicle because Flock's cameras have photographed it in more than one state.

d. a tool that scans the accumulated movement records of the general public and surfaces the people whose travel patterns Flock's software judges suspicious. Flock markets it as a way to detect patterns of suspicious activity across cities and states.

e. a tool that requires no plate, no name, and no physical description to perform a search. An officer supplies a place, a period of time, and a behavior, and the tool returns the people and vehicles that fit. One of its functions flags vehicles that visited three or more shops in three days. Another identifies likely witnesses by returning the vehicles most often seen in a neighborhood over the preceding fourteen days. It fuses camera data with police case files, arrest records, 911 dispatch logs, ballistics results, and commercial identity databases.

f. a tool that takes a license plate, connects it to a named human being, and then reaches into outside databases to assemble a profile of that person and of the people connected to that person. A Flock employee described it internally as the ability to jump from a plate to a person, to understand that person's context, and to link to other people related to that person.

g. a tool called "hot lists" that allows an agency to load whatever plates it chooses, for whatever reason it chooses, so that every camera on the network watches for them and pushes an instant alert when one passes. Nothing outside the agency validates the entry.

125. Flock sells a single console that fuses all of these tools together. Plate readers, video cameras, drones, microphones, live 911 calls, computer-aided dispatch, records management systems, and other vendors' cameras appear together on one live map. Flock advertises that the console will connect any vendor, supports unlimited users, carries public and private video together, and allows for any screen to serve as a command center.

**Flock designed its network so that no law enforcement agency can control who searches its cameras.**

126. Flock built a national mass surveillance network that any individual with a login can search without any meaningful safeguards. In August 2025, Flock informed Congress that approximately seventy-five percent of its law enforcement customers had opted into the national network, including Bow Mar and Columbine Valley. By Flock's own account, more than 5,000 law enforcement agencies use its cameras, and by 2026 Flock reported more than 120,000 cameras deployed in forty-nine states. In a single thirty-day period in the spring of 2025, users ran more than 450,000 searches. Flock's cameras read more than twenty billion license plates every month.

127. Law enforcement officers routinely abuse this system. For example, one Indiana deputy searched a single plate across more than 19,000 cameras in 1,558 separate cities and towns. Another Indiana officer searched 6,474 networks and 82,413 cameras. A Texas sheriff's deputy searched 6,809 networks and 83,345 cameras.

128. Flock sells the same cameras it sells to law enforcement agencies to homeowners' associations and private businesses. Flock then connects those private cameras to its network. This allows Flock and law enforcement agencies, including Bow Mar and Columbine Valley, to surveil individuals not only on public property but also on private property.

**Flock knowingly built a flawed product without the controls that would have stopped what happened to Ms. Elser.**

129. Flock allows users of its network to search its network without providing any reason for doing so. An analysis of Flock audit logs obtained by public records request from agencies across the country, covering 2023 through late 2025, documented officers entering expressions of laughter, insults aimed at the person being searched, an insult aimed at Flock's own software, the observation that someone was driving around being weird, a statement that the officer did not remember the case number and wished to be left alone, and long strings of random keystrokes. More than thirty agencies collectively logged over 6,300 searches for which the stated reason was that the reason was to be determined. One Alabama department alone accounted for 1,954 of those. Far larger numbers of officers entered nothing more than the word investigation, the word test, or nothing at all.

130. For the entire period before and including the period in which Defendant Milliman searched Ms. Elser's movements, Flock's system did not ask an officer to connect a search of the national network to any reason or case at all.

131. Flock's chief executive officer has publicly conceded that requiring a case number was an obvious way to curb abuse, but Flock has not fully implemented it to this day.

132. Flock did not develop any controls in its system to flag problematic searches until approximately April 2026, when Flock introduced a feature that automatically flags abnormal search activity for administrator review (including repeated queries against a single plate and searches run while an officer is off duty). Flock announced that, in recent weeks, those reviews had led to the arrests of several law enforcement officers who abused the system. For example, in Shively, Kentucky, Flock's new auditing tool flagged an officer who had run 2,048 searches of the mother of his child. He was arrested the day after it flagged him. In Peachtree City, Georgia, the same tool led the department to fire two officers.

133. Flock could have built that control at any time. The patterns it detects were present in Flock's own logs from the beginning of its operation as a company. Flock only built it in 2026 after five years of documented abuse, including the violation of Ms. Elser's rights.

134. Flock does not require multifactor authentication. Members of Congress, citing a cybersecurity firm's database of credentials stolen by malware, reported that passwords for at least thirty-five Flock customer accounts had been stolen. A federal Drug Enforcement Administration task force officer used a local detective's Flock credentials, without the detective's knowledge, to run a search (and the practice of borrowing that detective's login was common on the task force).

135. Every one of these controls arrived after the network reached national scale and after years of well-documented abuses of Flock's system. Not one of them was in place when Defendant Milliman used Flock's system to search for Ms. Elser and her vehicle without reasonable suspicion to do so and unlawfully issue her a citation without probable cause.

**Officers across the country have used Flock's network to stalk women.**

136. The Institute for Justice has documented sixty-six separate incidents, between September 2021 and September 2026, in which police officers used ALPR systems to follow romantic interests, spouses, family members, or strangers. Most of those incidents came to light because the victim complained. They did not come to light through any internal investigation by Flock.

137. The Institute for Justice maintains a broader database of 241 cataloged incidents of ALPR misuse and failure. It describes that database as the most comprehensive list publicly available and as likely the tip of the iceberg.

138. A newspaper investigation published in August 2026 identified at least forty-six law enforcement officers charged with or accused of misusing Flock's system. Of those forty-six, twenty-six involved officers surveilling wives, girlfriends, former partners, their former partners' new partners, or women the officers wanted to meet.

139. In Thornton, Colorado, a community group's April 2026 complaint alleged that a single officer's Flock account ran 19,194 searches between October 2023 and December 2025, only twenty-nine of which carried a case number. The Thornton Police Department's own audit confirmed that the officer ran 10,318 searches in that period and concluded that his use complied with a department policy that, at the time, required neither a case number nor a documented reason. That officer's search volume exceeded that of every other operator in his department. His stated reasons included the word plate, the phrase Mexico plate, the phrase no record, and the word misuse. He ran searches outside his working hours. He queried the same license plate repeatedly across a span of 145 days. Flock's system had no controls in place to prevent him

from performing that number of searches or from performing searches without reasonable suspicion or probable cause.

**Law enforcement has used Flock's network to unlawfully target immigrants, women seeking reproductive care, protesters, and ethnic minorities.**

140. In 2025, public records revealed that United States Customs and Border Protection had direct access to search more than 80,000 Flock cameras nationwide through a pilot program Flock had not disclosed. Between May 13 and June 13, 2025, that agency ran at least 118 searches of Flock's network, each encompassing at least 6,315 individual Flock networks and at least 82,000 devices. Those searches included the network of the Boulder, Colorado, Police Department, whose own settings prohibited the use of its cameras for immigration enforcement.

141. Flock's chief executive officer conceded publicly that Flock had engaged in pilot programs with Customs and Border Protection and with Homeland Security Investigations and that Flock had not created distinct permissions and protocols in its system to ensure that federal users complied with local law.

142. An audit by the Illinois Secretary of State, announced on August 25, 2025, examined twelve Illinois law enforcement agencies and found that Flock had allowed federal immigration authorities to reach Illinois license plate data in violation of Illinois law, and that Flock did not have proper safeguards in place for data sharing. That audit further found that Flock's own leadership was unaware of the federal pilot program Flock was running.

143. In Johnson County, Texas, in 2025, a sheriff's deputy searched 6,809 Flock networks and 83,345 cameras for a woman who deputies believed had self-administered an abortion. The stated reason recorded in Flock's log was that the subject had an abortion and that the officer was searching for a female. The sheriff's office's own records show that deputies

opened a death investigation concerning a non-viable fetus, logged evidence of the woman's abortion, and consulted the District Attorney's office about charging her.

144. Between December 2024 and October 2025, more than fifty federal, state, and local agencies ran hundreds of searches through Flock's national network in connection with protest activity. Nineteen of those agencies ran searches tied specifically to the No Kings protests. Flock itself taught law enforcement agencies how to surveil protesters lawfully exercising their First Amendment rights. In a November 2025 Flock webinar, Flock's director of market management walked officers through a scenario in which an incident commander uses a Flock dashboard to monitor a No Kings protest, including live video of the protest as it moved through a park. Flock overlaid the demonstration dashboard on a map of the City of Denver. The same webinar demonstrated a Flock tool that combines license plate data with an agency's other data, including personal data, internet protocol data, email data, sex offender registry data, vehicle data, and open source intelligence, so that once an officer has a license plate, the system returns the driver's name, address, email, social media accounts, telephone number, and affiliations.

145. Between June 2024 and October 2025, more than eighty law enforcement agencies ran Flock searches using ethnic slurs against Romani people. Many of those searches identified no suspected crime at all. One Texas department ran such searches through the feature that identifies vehicles traveling together.

**Flock's system is consistently incorrect and leads to routine violations of citizens' constitutional rights.**

146. Flock advertises that in optimal deployment conditions it measures better than ninety-six percent accuracy in reading the characters on a license plate. However, its system has

consistently produced results that have violated the constitutional rights of citizens in Colorado and nationwide.

147. The Institute for Justice has documented twenty-seven cases since 2018 in which an ALPR error led police to stop, detain, or jail an innocent person, and it describes that figure as most likely an undercount. In nearly two-thirds of those cases, officers drew and pointed their guns at the innocent person before discovering the error. Roughly one-third of the errors were machine errors, most often the failure to distinguish the numeral zero from the letter O or the numeral two from the numeral seven. Roughly two-thirds were human errors in entering or interpreting the data.

148. Oak Park, Illinois, found that one-third or more of the stops its officers made on the strength of a Flock alert ended with the driver released because the data was wrong. Oak Park's Citizen Police Oversight Committee concluded that there was no evidence whatsoever that Flock's cameras had played a meaningful role in any Oak Park crime investigation since their installation in 2022.

149. In Cherry Hills Village, Colorado, officers pulled over a man named Kyle Dausman twice because Flock cameras flagged his plate as associated with an active warrant. Mr. Dausman has no warrant. The false hit traced to an ambiguity between the letter O and the numeral zero in a Gilpin County failure-to-appear entry. Cherry Hills Village suppressed the alert in its own system but could not remove Mr. Dausman from the statewide Colorado Crime Information Center hot list against which Flock's cameras check every plate they read.

**Flock falsely advertises its product to the public and coaches its law enforcement partners to lie to the public about it.**

150. Flock's chief communications officer has stated publicly that Flock is not tracking people. This is false.

151. Flock states publicly that customers own their data and decide who may access it. This is false.

152. Flock has responded to public concern about all of this not by putting controls into place to protect individuals' privacy rights or to protect consumers from abuse, but by coaching police on how to discuss its products. Flock distributes a guide to law enforcement on how to speak to governments about public safety technology. The guide instructs police to speak positively about Flock and have a carefully scripted presentation ready to discuss Flock.

153. That is the playbook Flock ran in Columbine Valley in 2021, when its territory manager offered to review the slides and strategize with Defendant Cottrell before the Board meeting that approved the Flock contract, and then thanked him for including Flock in the presentation to the Board.

**Flock has known its product is dangerous and violates privacy rights, but it has continued to expand its mass surveillance network nationwide.**

154. Flock knew, at every relevant time, that officers were using its system to track people without warrants for reasons unrelated to any crime, that officers were treating Flock hits as proof of guilt without additional evidence, and that its reason field and its audit logs were not preventing abuse. Flock learned this from its own logs, its own customers, Congress, state auditors, press reports, and the arrests of officers who used its product to stalk people.

155. Flock did not redesign its product to require a warrant, a case number, or supervisory approval before an officer could reconstruct a person's movements. Instead, it continued selling its systems and even expanded its systems so that officers could further violate the rights of the public.

156. Colorado communities have begun to respond. In February 2026, Denver announced that it would not renew its contract with Flock. Denver had already cut off a

neighboring Colorado department that accepted a Border Patrol invitation to search its data. In February 2026, Colorado legislators introduced a bipartisan bill that would have required a warrant to search a location-tracking database like Flock's for data more than seventy-two hours old; the bill died in April 2026 amid law enforcement opposition.

157. Despite knowing that officers routinely use Flock to violate the constitutional rights of Coloradans, Columbine Valley and Bow Mar have changed nothing about their use of Flock's system. Upon information and belief, both towns continue to operate Flock's cameras today under the same terms, and with the same absence of safeguards, that produced the false accusation against Ms. Elser.

**Columbine Valley's policies, customs, and practices caused the violations of Ms. Elser's rights.**

158. The constitutional violations described in this Complaint were not the product of a single officer's error. They were the direct and foreseeable result of the policies, customs, and practices of Columbine Valley, adopted and maintained by Defendant Cottrell as Columbine Valley's final policymaker for law enforcement and for the use of Flock's surveillance system.

159. Columbine Valley maintained an express policy, or in the alternative a custom and practice so persistent and widespread as to have the force of policy, of collecting, retaining, and sharing the location data of every vehicle that passes its and Bow Mar's Flock cameras, and of permitting every CVPD officer to search that data, including the historical movements of any identified vehicle, without a warrant, without probable cause, without reasonable suspicion, without supervisory approval, and without any documented connection to an open investigation.

160. Defendant Cottrell personally made those decisions. He signed the contracts with Flock, chose the camera locations with Flock, served as the administrator of CVPD's Flock account, and controlled which officers had access and what they could search. He authorized

Flock to share CVPD's data with every police department in Colorado, present and future. He gave Defendant Milliman unrestricted access to the system and designated him CVPD's point of contact for Flock in his absence. And he adopted no policy limiting what any officer could do within the Flock system.

161. Columbine Valley failed to train its officers, including Defendant Milliman, on the constitutional limits of retrospective location searches; on the evidentiary limits of a license plate photograph; on the requirement of probable cause before charging a person with a crime; and on the duty to consider readily available exculpatory evidence. The need for such training was obvious.

162. Columbine Valley failed to supervise its officers' use of Flock's system. Upon information and belief, it did not audit officers' searches, did not require a case number or documented reason, did not review the reason field, and did not require supervisory approval before an officer searched a person's historical movements or charged a person with a crime based on a Flock hit. Defendant Cottrell, the department's Flock administrator, could see every search his officers ran and did not adequately monitor his officers' use of the Flock system.

163. Columbine Valley hired and retained Defendant Milliman with deliberate indifference to the plainly obvious consequence that he would violate the rights of the people he investigated. Columbine Valley knew that the Jefferson County Sheriff's Office had fired him for failing to take citizens' reports, failing to document his work, and failing to honor a suspect's constitutional rights. Those were not generalized concerns about his fitness. They were the specific failures that a reasonable policymaker would have recognized as making it plainly obvious that, given a powerful surveillance tool and no supervision, Defendant Milliman would fail to investigate, fail to document, and fail to honor the rights of the people he accused.

Columbine Valley hired him anyway, kept no record of its reasons for doing so, promoted him to sergeant, and made him one of the two officers who could use the Flock system.

164. Columbine Valley ratified Defendant Milliman's conduct. After a full review of the events described in this Complaint, Mr. McCrumb, acting as Columbine Valley's Town Administrator and speaking for the Town, declared that Defendant Milliman had a reasonable belief in issuing the summons based on the evidence and information available to him at the time. Defendant Cottrell, Columbine Valley's final policymaker for law enforcement, reviewed the same events and reprimanded Defendant Milliman only for his demeanor. Neither found any fault in the warrantless search of Ms. Elser's movements, the decision to charge her with a crime on the basis of a license plate photograph showing only her vehicle nearby at the time the crime occurred, or the refusal to consider exculpatory evidence. By approving the basis for Defendant Milliman's conduct after the fact, Columbine Valley's final policymakers adopted that conduct as the Town's own.

165. Upon information and belief, Defendant Milliman's conduct toward Ms. Elser was not an isolated event. Upon information and belief, CVPD officers routinely search the historical movements of vehicles photographed by Bow Mar's and Columbine Valley's cameras in connection with low-level property offenses, and routinely treat the presence of a vehicle in town as grounds for suspicion of its owner. Defendant Cottrell described Defendant Milliman's practice to a reporter as the department's standard method.

166. Bow Mar is independently responsible for the violations of Ms. Elser's rights. Bow Mar authorized, funded, and approved the installation and operation of the six Flock cameras that photographed Ms. Elser on its public streets. Bow Mar's mayor personally endorsed Flock's product in Flock's marketing materials. Bow Mar contracts with Columbine Valley for

police services and knew that CVPD officers would search the data from Bow Mar's cameras without a warrant. Bow Mar adopted no policy restricting the collection, retention, sharing, or searching of that data. Bow Mar's own officials used the same cameras for a municipal traffic study. Bow Mar's decision to deploy a warrantless surveillance dragnet on its public streets, and to place that dragnet in the hands of CVPD with no restrictions, was a policy decision of Bow Mar's final policymakers and a moving force behind the search of Ms. Elser's movements.

167. The policies, customs, and practices of Columbine Valley and Bow Mar described above were the moving force behind the violations of Ms. Elser's constitutional rights. Had either town required a warrant, or even reasonable suspicion, before an officer could search a person's historical movements, Defendant Milliman could not have reconstructed a month of Ms. Elser's travels to investigate a twenty-five-dollar package theft. Had either town trained its officers that a Flock hit is not probable cause, Defendant Milliman would not have written a summons before knocking on her door. Had Columbine Valley supervised, audited, or disciplined its officers' use of Flock's system, Defendant Milliman would have known that someone was watching him, too.

**Flock acted jointly with Columbine Valley and Bow Mar while performing a public function.**

168. Flock designed, built, owns, installs, maintains, and operates the cameras that photographed Ms. Elser. Flock owns and operates the servers on which it stored her movements. Flock wrote the software that Defendant Milliman used to search Ms. Elser's movements. When Defendant Milliman typed Ms. Elser's license plate into Flock's system, Flock's computers retrieved a month of her movements and displayed them to him.

169. Flock installed its cameras on Bow Mar's and Columbine Valley's public rights-of-way under the authority of those municipalities. Flock could not have photographed a single

vehicle on Sheridan Boulevard without the towns' permission to occupy public property, and the towns could not have tracked the movements of Ms. Elser, or anyone else, without Flock's hardware, software, and servers. Flock retains final discretion to veto any camera location, and Columbine Valley and Bow Mar may not remove, reposition, adjust, or otherwise take control of Flock's hardware.

170. Flock did not merely sell CVPD a product. Flock created CVPD's account. Flock designated Defendant Cottrell its administrator. Flock trained Defendant Cottrell and Defendant Milliman personally. Flock connected CVPD's account to the National Crime Information Center so that Bow Mar's cameras would generate law enforcement hot list alerts. Flock moved CVPD's users onto the law enforcement side of its product so that they could use its law enforcement tools. Flock designated Defendant Cottrell a power user. Flock prepared and co-presented the pitch to Columbine Valley's Board of Trustees. Flock sought and obtained Defendant Cottrell's blessing to share the towns' camera data with every other police department in Colorado. Flock returned, year after year, to sell CVPD and Bow Mar more features and more surveillance.

171. Flock exercises powers traditionally and exclusively reserved to the state. The systematic surveillance of the public's movements on public streets, the maintenance of an investigative database of those movements for the use of police, the generation of real-time alerts to police based on criminal justice hot lists, and the provision of investigative answers that officers use to decide whom to charge with crimes are functions of law enforcement. No private company may lawfully conduct them on public property except as an arm of the government.

172. Flock does not merely supply a tool that the police use. Flock performs the surveillance itself. Flock's cameras capture the movements of individuals, its servers maintain

those records, and its software gives anyone with access to the system the unlimited ability to track any particular person's movements.

173. Flock knew that officers would use its system exactly as Defendant Milliman used it. Flock also knew that Columbine Valley and Bow Mar had no policy governing their officers' use of the system (because Flock had helped Columbine Valley and Bow Mar set the system up).

174. Flock is therefore a willful participant in joint activity with Columbine Valley, Bow Mar, and their officers. Flock's collection, retention, and disclosure of Ms. Elser's movements to Defendant Milliman, and Defendant Milliman's search of those movements, were a single, integrated course of conduct undertaken jointly by Flock and the towns under color of state law.

**Defendants' conduct has caused Ms. Elser significant damages.**

175. Ms. Elser has done nothing wrong. She has nonetheless paid, and continues to pay, a heavy price for Defendants' conduct.

176. In the days after September 27, 2025, Ms. Elser could not eat or sleep. She lost five pounds in three days. Her smartwatch repeatedly alerted her that her resting heart rate was far above normal. Over the weeks that followed, she lost more than fifteen pounds and developed stress-induced hair loss that required medical treatment.

177. Terrified that word of the charge would reach her employer or her clients before her December court date, she reported the accusation to her employer herself. For more than a month before Defendant Milliman knocked on her door, she had been preparing to deliver a keynote address at a major industry event. She withdrew from it.

178. Ms. Elser and her husband spent days assembling the evidence of her innocence, and they have spent countless hours since then dealing with the consequences of Defendants' conduct. They have incurred out-of-pocket expenses, including the cost of additional security systems, recording devices, and locks that Ms. Elser installed at her home to feel safe in it.

179. Ms. Elser's neighbors witnessed a uniformed officer accuse her of a crime on her front porch.

180. Ms. Elser now lives with a persistent fear that her license plate is flagged in a database she cannot see, and that every Flock camera and every police vehicle she passes may be the start of another accusation. Driving, once routine, causes her chest to tighten. The sight of a police cruiser triggers panic. She has lost confidence in her ability to move freely through her own community and in the presumption of innocence that she had always believed protected her.

## CLASS ALLEGATIONS

181. Ms. Elser brings the Fifth and Sixth Claims for Relief, each of which is asserted against Defendant Flock, individually and on behalf of all others similarly situated, pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

### The Class

182. Damages Class, Federal Rule of Civil Procedure 23(b)(3). The proposed "Damages Class" is defined as all persons who own or lease a motor vehicle that one or more of Flock's automated license plate reader cameras in Colorado photographed during the applicable limitations period, and whose vehicle's license plate, photograph, location, date, and time of capture Flock recorded and retained on its servers.

183. Injunctive and Declaratory Relief Class, Federal Rule of Civil Procedure 23(b)(2). The proposed "Injunctive and Declaratory Relief Class" is defined as all persons who own or

lease a motor vehicle that one or more of Flock's automated license plate reader cameras in Colorado has photographed or will photograph, and whose vehicle's license plate, photograph, location, date, and time of capture Flock has recorded and retained, or will record and retain, on its servers.

184. The Damages Class and the Injunctive and Declaratory Relief Class are referred to together in this Complaint as the "Class."

185. Excluded from the Class are Flock, its officers, directors, agents, affiliates, parents, subsidiaries, and any entity in which Flock has a controlling interest, together with Flock's legal representatives, successors, and assigns. Also excluded are the judicial officers to whom this case is assigned and their staff and immediate families, counsel for the parties, and any person who timely and properly requests exclusion.

186. Ms. Elser is a member of both the Damages Class and the Injunctive and Declaratory Relief Class. Flock's cameras in Bow Mar photographed her and her vehicle approximately twenty times in the month preceding September 27, 2025, and Flock recorded and retained this data on its servers.

187. Ms. Elser reserves the right to amend or modify the class definitions, to add or divide subclasses, and to propose issue classes, after she has had the opportunity to obtain discovery of Flock's records.

**The Class is so numerous that joinder is impracticable.**

188. Flock's cameras operate continuously. They photograph every vehicle that passes them, twenty-four hours a day, and they do not distinguish between a suspect and anyone else. Flock has installed cameras on public streets in communities across Colorado, and it contracts with dozens of Colorado municipalities and law enforcement agencies.

189. The number of Coloradans whose vehicles Flock has photographed and whose movements Flock has recorded and retained is in the thousands. Joinder of them is impracticable.

**The Class is ascertainable from Flock's records.**

190. Membership in the Class turns on objective criteria: whether Flock photographed a person's vehicle in Colorado, and whether Flock recorded and retained that capture.

191. Flock's product is the creation, indexing, storage, and retrieval of exactly these records. Flock's system stores each capture with the plate, the photograph, the location, the date, and the time. Flock sells its customers the ability to search those records by plate and to retrieve every capture associated with that plate. Flock retains an audit log of every search.

192. The records that identify the members of the Class are therefore in Flock's exclusive possession, in searchable form, and organized by precisely the field that identifies a Class member.

**Questions of law and fact common to the Class predominate over any question affecting only individual members.**

193. Every claim in this section arises from a single course of conduct. Flock designed one system and deployed that system in Colorado on uniform terms. It made the same representations about that system to every municipality that bought it and to every public body that approved it. It captured the same categories of data about every vehicle. It applied the same search interface and absence of safeguards to every person whose vehicle it photographed. Flock did not treat Ms. Elser differently from anyone else.

194. The questions of law and fact common to the Class include, without limitation, the following:

a. First, as to intrusion upon seclusion: whether Flock's photographing, cataloging, retention, aggregation, and disclosure of a person's movements over time is an

intrusion upon that person's seclusion; whether that intrusion is intentional; whether that intrusion would be highly offensive to a reasonable person; and whether a person retains an expectation of seclusion in the whole of her movements notwithstanding that any single trip occurred on a public road.

b. Second, as to negligence: whether Flock owes a duty of reasonable care to the persons whose movements its cameras record and whose records its system discloses to police; whether Flock undertook to render services necessary for the protection of those persons; whether Flock breached its duty by designing a system that permits any user to retrieve the full historical movements of any vehicle with no warrant, no case number, no supervisory approval, and no technical safeguard of any kind; whether Flock breached its duty by failing to warn the officers who use its system that a hit is not probable cause; whether a reasonably careful designer would have built those safeguards; and whether it was foreseeable to Flock that the absence of those safeguards would cause officers to search the movements of innocent people and to accuse them of crimes.

195. The existence of individualized damages does not defeat predominance where, as here, liability turns entirely on Flock's uniform conduct.

**Ms. Elser's claims are typical of the claims of the Class.**

196. The same cameras, running the same software, built by the same company, on the same terms, photographed Ms. Elser and every other member of the Class. Flock recorded her movements in the same database, with the same fields, under the same retention setting, and made them available for search through the same interface, with the same absence of safeguards, as it did for every other member of the Class. Ms. Elser's injury is the same as the injury of every

Class member. Flock took the record of where she went and when, kept it, and made it retrievable by anyone with a login.

197. Ms. Elser's circumstances would not require her to prove anything different from what every Class member must prove, nor would they subject her to any defense not applicable to the Class.

**Ms. Elser and her counsel will fairly and adequately represent the Class.**

198. Ms. Elser has no interest antagonistic to the interests of any member of the Class. She seeks no relief that is adverse to the Class. She understands the responsibilities of a class representative and is prepared to discharge them.

199. Ms. Elser has retained counsel experienced in civil rights litigation, complex litigation, and class actions. Mari Newman and Andy McNulty have collectively litigated civil rights cases for more than forty years, and each has dedicated an entire professional career to representing plaintiffs in civil rights and public interest litigation.

200. Ms. Elser's counsel have experience serving as class counsel. Ms. Newman and Mr. McNulty represented a putative class of protesters dispersed from a violin vigil honoring the life of Elijah McClain. *Minter v. City of Aurora,* No. 1:20-cv-02172-RMR-MEH (D. Colo.). They served as class counsel in *Winston v. Polis,* on behalf of a class of Colorado Department of Corrections inmates vulnerable to the COVID-19 pandemic. No. 2020CV031823 (Colo. Dist. Ct.). Mr. McNulty litigated *Carranza v. Reams*, on behalf of a class of people confined at the Weld County Jail, and obtained a preliminary injunction requiring basic precautions against the transmission of COVID-19. No. 1:20-cv-00977-PAB-SKC (D. Colo.). Mr. McNulty was appointed class counsel in, litigated, and was instrumental in settling a class action on behalf of Denver's houseless population. *Lyall v. Denver*, No. 1:16-cv-02155-WJM-SKC (D. Colo.). Ms.

Newman represented plaintiffs in two putative class and collective actions on behalf of workers seeking fair pay. *Santich v. VCG*, No. 17-cv-00631-RM-MEH (D. Colo.); *Miles v. Ella Bliss,* No. 18-cv-1212-PAB-MEH (D. Colo.).

201. Ms. Elser's counsel will commit the resources necessary to prosecute this action on behalf of the Class. Ms. Elser knows of no conflict among herself, her counsel, and any member of the Class.

**A class action is the only realistic way these claims will ever be adjudicated.**

202. Almost no member of the Class knows that she is a member of the Class. Flock's system contains no feature that notifies a person that her vehicle has been photographed, that her movements have been compiled, or that an officer has searched them.

203. Concentrating these claims in this forum is efficient and appropriate. The conduct occurred in Colorado. The cameras are on Colorado streets. The contracts are with Colorado governments. The Class members are Coloradans. Ms. Elser is aware of no other litigation by members of the Class against Flock concerning this conduct in Colorado, and she anticipates no unusual difficulty in managing this action as a class action.

**Flock has acted on grounds that apply generally to the Class.**

204. Flock has refused to require a warrant, a case number tied to an open investigation, and supervisory approval before searching a person's location history. It has refused to build any technical safeguard that would stop an officer from reconstructing a person's movements for any reason or for no reason. These actions apply to every Class member.

205. Final injunctive relief and corresponding declaratory relief are therefore appropriate as to the Class as a whole. The relief Ms. Elser seeks, which is an order requiring Flock to stop collecting, retaining, and disclosing the movement records of Coloradans without

lawful authority, and to build safeguards that would protect Coloradans, would necessarily benefit every member of the Class in the same way.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment: Unreasonable Search

*Plaintiff Against All Defendants*

206. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

207. Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

208. Defendants are "persons" under 42 U.S.C. § 1983.

209. The Fourth Amendment to the United States Constitution guarantees the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures.

210. Ms. Elser has a reasonable expectation of privacy in the whole of her physical movements, including the record of when and where she traveled over the course of a month. That expectation is one that society recognizes as reasonable. Society has never expected that law enforcement would, or could, secretly monitor and catalog every movement of a person.

211. The Fourth Amendment protects a person's historical location records. Flock's database records everyone rather than only those under investigation, allows police to travel back in time to track an individual's movements, and lets the government reconstruct any person's movements using a few search terms and the click of a mouse.

212. Defendant Milliman conducted a search of Ms. Elser within the meaning of the Fourth Amendment when, without a warrant, he accessed Flock's database and retrieved the record of her vehicle's movements through Bow Mar over the preceding month, including the date, time, and location of each of approximately twenty captures of her license plate.

213. Defendant Milliman's search was unreasonable. Defendant Milliman did not have a warrant, probable cause to believe that Ms. Elser, or her vehicle, had been involved in any crime, or reasonable suspicion. No exception to the warrant requirement applied to Defendant Milliman's search.

214. Defendant Cottrell personally caused the search by creating, implementing, and maintaining the policy under which every CVPD officer, including Defendant Milliman, could search the historical movements of any vehicle in Flock's database without a warrant, probable cause, reasonable suspicion, supervisory approval, or any documented investigative justification; by granting Defendant Milliman that access; by authorizing the retention and sharing of the data he searched; and by failing to train or supervise Defendant Milliman in its use. Defendant Cottrell acted with deliberate indifference to the obvious risk that officers would use the system to search the movements of innocent people without any lawful basis.

215. Defendants' conduct is ongoing. Ms. Elser has no way to travel between her home and the community around her without being photographed and cataloged, and no way to know who has searched her location history.

216. Defendant Flock caused the search by collecting and retaining Ms. Elser's location data for the express purpose of making it available to CVPD officers on demand, by designing and operating a system that permitted retrospective searches of any person's movements without a warrant or any documented justification, by training Defendants Cottrell

and Milliman how to use that system, and by retrieving and disclosing Ms. Elser's location history to Defendant Milliman in response to his warrantless query.

217. Defendants Columbine Valley, Bow Mar, and Flock, acting jointly and under color of state law, operate a network of thirteen fixed cameras in Columbine Valley and Bow Mar, including six that photograph every vehicle entering or leaving Bow Mar; record each vehicle's license plate, make, type, color, and distinguishing features; record the date, time, and location of each capture; store that data for at least thirty days on Flock's servers; make it searchable by every CVPD officer, and by officers of every other Colorado agency with which Defendant Cottrell has agreed to share it, at will; and generate real-time alerts to police based on criminal justice hot lists.

218. Defendant Flock performed a public function in collecting and retaining Ms. Elser's location data and acted in concert with Defendants Columbine Valley and Bow Mar to violate Ms. Elser's constitutional rights.

219. Columbine Valley and Bow Mar are liable for the search because Defendant Milliman carried it out pursuant to their official policies, customs, and practices, as alleged above, and because those policies, customs, and practices, including the decision to deploy Flock's system without any warrant requirement or other safeguard, the failure to train and supervise officers in its use, the hiring and retention of Defendant Milliman, and the ratification of his conduct, were the moving force behind the violation of Ms. Elser's rights.

220. Defendants' conduct was objectively unreasonable and was undertaken intentionally, willfully, and wantonly, and with reckless disregard for Ms. Elser's constitutional rights.

221. As a direct and proximate result of Defendants' conduct, Ms. Elser suffered the injuries, damages, and losses described above.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth and Fourteenth Amendments**
**Malicious Prosecution**
*Plaintiff Against Defendants Columbine Valley, Bow Mar, Milliman, and Cottrell*

222. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

223. Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

224. Defendants are "persons" under 42 U.S.C. § 1983.

225. Defendant Milliman initiated a criminal prosecution against Ms. Elser by issuing and serving on her a criminal summons and complaint charging her with theft and commanding her to appear in the Jefferson County court in December 2025.

226. Defendant Milliman initiated the prosecution of Ms. Elser without probable cause. The only evidence connecting Ms. Elser to the theft was Flock's photograph of her license plate on a public street, which showed her truck passing through Bow Mar without stopping. The doorbell video of the theft showed a thief who did not resemble Ms. Elser, fled on foot, and never entered a vehicle that looked like Ms. Elser's. No reasonable officer could have believed that the evidence available to Defendant Milliman established probable cause to charge Ms. Elser with theft.

227. Ms. Elser offered Defendant Milliman evidence of her whereabouts, and he refused to look at it. Defendant Milliman failed in his duty to adequately investigate before issuing Ms. Elser a criminal summons and complaint.

228. Defendant Milliman acted with malice. He told Ms. Elser that her guilt was certain when he had no basis for that certainty. He refused to show her the evidence or tell her the date or location of the offense. He refused to look at her exculpatory evidence. Defendant Milliman's purpose was not to determine the truth.

229. The criminal proceeding terminated in Ms. Elser's favor.

230. The summons Defendant Milliman issued compelled Ms. Elser to appear in court, subjected her to the authority of the criminal justice system for eighteen days, and constituted a seizure of her person within the meaning of the Fourth Amendment.

231. Columbine Valley and Bow Mar are liable for the prosecution because Defendant Milliman carried it out pursuant to their official policies, customs, and practices, as alleged above, and because those policies, customs, and practices, including the decision to deploy Flock's system without any warrant requirement or other safeguard, the failure to train and supervise officers in its use, the hiring and retention of Defendant Milliman, and the ratification of his conduct, were the moving force behind the violation of Ms. Elser's rights.

232. Defendant Cottrell personally caused the prosecution by creating, implementing, and maintaining the policy under which every CVPD officer, including Defendant Milliman, could search the historical movements of any vehicle in Flock's database without a warrant, probable cause, reasonable suspicion, supervisory approval, or any documented investigative justification and use that information to prosecute innocent people; by granting Defendant Milliman that access; by authorizing the retention and sharing of the data he searched; and by

failing to train or supervise Defendant Milliman in its use. Defendant Cottrell acted with deliberate indifference to the obvious risk that officers would use the system to search the movements of innocent people without any lawful basis and use those results to prosecute them.

233. Defendant Milliman's conduct was objectively unreasonable and was undertaken intentionally, willfully, and wantonly, and with reckless disregard for Ms. Elser's constitutional rights.

234. As a direct and proximate result of Defendants' conduct, Ms. Elser suffered the injuries, damages, and losses described above.

**THIRD CLAIM FOR RELIEF**[1]
**C.R.S. § 13-21-131**
**Colo. Const. art. II, § 7**
**Unlawful Search and Seizure**
*Plaintiff Against Defendants Milliman and Cottrell*

235. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

236. Defendants Milliman and Cottrell are peace officers as defined in C.R.S. § 24-31-901(3), employed by a political subdivision of the State of Colorado and required to be certified by the Peace Officer Standards and Training Board, and are therefore subject to liability under C.R.S. § 13-21-131(1).

237. At all times relevant to this Complaint, Defendants Milliman and Cottrell acted under color of law.

238. Article II, Section 7 of the Colorado Constitution secures the right of the people to be free from unreasonable searches and seizures of their persons, papers, homes, and effects.

[1] Plaintiff brings this claim in good faith for the express purpose of extending and/or modifying existing precedent.

239. The Colorado Supreme Court has repeatedly held that Article II, Section 7 protects a broader range of privacy interests than the Fourth Amendment as construed by the United States Supreme Court. In particular, the Colorado Supreme Court has held that Coloradans retain a reasonable expectation of privacy in records of their activities held by third parties, including bank records, the telephone numbers dialed from a home telephone, telephone toll records, and internet search history, and that the warrantless installation and monitoring of an electronic tracking device is a search under the Colorado Constitution. The Colorado Supreme Court has also recognized that prolonged, technologically enhanced surveillance of a person's activities is a search even when each individual observation could have been made from a public vantage point.

240. Ms. Elser has a reasonable expectation of privacy, protected by Article II, Section 7, in the record of her physical movements over time, including the record of when and where her vehicle passed Defendants' cameras. That expectation is at least as robust under the Colorado Constitution as under the Fourth Amendment.

241. Defendant Milliman searched Ms. Elser, in violation of Article II, Section 7, when he accessed Flock's database without a warrant and retrieved the record of her vehicle's movements through Bow Mar over the preceding month.

242. Defendant Cottrell searched and seized Ms. Elser, in violation of Article II, Section 7, by authorizing, directing, and overseeing the warrantless, suspicionless collection, cataloging, retention, and sharing of the record of her movements through Flock's cameras, and by adopting and maintaining the policy under which any CVPD officer could search that record at will. Defendant Cottrell continues to do so today.

243. Defendants conducted their searches and seizures of Ms. Elser without a warrant, and those searches and seizures are therefore presumptively unreasonable under the Colorado Constitution. No exception to the warrant requirement applies.

244. Pursuant to C.R.S. § 13-21-131(2)(b), qualified immunity is not a defense to this claim. Pursuant to C.R.S. § 13-21-131(2)(a), the Colorado Governmental Immunity Act does not apply to this claim.

245. Defendant Milliman's and Defendant Cottrell's conduct was objectively unreasonable and was undertaken intentionally, willfully, and wantonly, and with reckless disregard for Ms. Elser's constitutional rights.

246. As a direct and proximate result of Defendants' conduct, Ms. Elser suffered the injuries, damages, and losses described above.

**FOURTH CLAIM FOR RELIEF**[2]
**C.R.S. § 13-21-131**
**Colo. Const. art. II, § 7**
**Unreasonable Seizure and Malicious Prosecution**
*Plaintiff Against Defendants Milliman and Cottrell*

247. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

248. Defendant Milliman, a peace officer acting under color of law, initiated a criminal prosecution against Ms. Elser without probable cause and with malice, as alleged above, by issuing and serving on her a criminal summons and complaint charging her with theft and compelling her to appear in court in another county on pain of arrest.

[2] Plaintiff brings this claim in good faith for the express purpose of extending and/or modifying existing precedent.

249. The issuance of that summons was a seizure of Ms. Elser's person within the meaning of Article II, Section 7 of the Colorado Constitution. It subjected her to the compulsory process of the criminal courts, restrained her liberty, and placed her under the continuing authority of the State for eighteen days.

250. The seizure was unreasonable because no probable cause or other lawful justification supported it.

251. The criminal proceeding terminated in Ms. Elser's favor.

252. Pursuant to C.R.S. § 13-21-131(2)(b), qualified immunity is not a defense to this claim. Pursuant to C.R.S. § 13-21-131(2)(a), the Colorado Governmental Immunity Act does not apply to this claim.

253. Defendant Milliman's and Defendant Cottrell's conduct was objectively unreasonable and was undertaken intentionally, willfully, and wantonly, and with reckless disregard for Ms. Elser's constitutional rights.

254. As a direct and proximate result of Defendants' conduct, Ms. Elser suffered the injuries, damages, and losses described above.

**FIFTH CLAIM FOR RELIEF**[3]
**Colorado Common Law**
**Invasion of Privacy**
**Intrusion upon Seclusion**
*Plaintiff, Individually and on Behalf of the Class, Against Defendant Flock*

255. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

256. Ms. Elser brings this claim individually and on behalf of the Class.

[3] Plaintiff brings this claim in good faith for the express purpose of extending and/or modifying existing precedent.

257. Colorado recognizes the tort of unreasonable intrusion upon the seclusion of another. A defendant is liable where it has intentionally intruded, physically or otherwise, upon the plaintiff's seclusion or solitude, and a reasonable person would consider the intrusion highly offensive.

258. Flock intentionally intruded upon Ms. Elser's seclusion by creating a detailed mosaic of her movements. Flock photographed Ms. Elser every time she passed one of its cameras, cataloged her vehicle's make, type, color, distinguishing features, and license plate, recorded the date, the time, and the location of every instance where she passed a Flock camera, and compiled those instances into a single continuous record of where she had been and when she had been there. It retained that record on its servers and made it retrievable by any officer with a login to its system.

259. Ms. Elser never consented to Flock surveilling and tracking her. No member of the Class consented either, and Flock has never given any of them the chance to do so.

260. Flock's intrusion was intentional. Flock designed its system to do exactly what it did to Ms. Elser, and it did so to her, and to every other person who drives past its cameras, deliberately, continuously, and for profit.

261. Flock intruded upon the seclusion of every member of the Class in the same way, by the same means, and through the same system. It made each Class member's record available to every officer with a login, and to agencies throughout Colorado and beyond through its sharing network.

262. Flock's intrusion would be highly offensive to a reasonable person. A reasonable person does not expect that a private company will photograph and catalog every trip she takes past the edge of her neighborhood, compile those trips into a searchable month-long record of

her movements, and provide that record to a police officer, with no warrant, to be used to accuse her of a crime she did not commit. Society has never expected that anyone would, or could, secretly monitor and catalog every movement of a person in or near a town.

263. Ms. Elser finds it highly offensive. She did not know Flock's cameras existed, nor did she know that a private company had been recording her movements for years.

264. Flock gave Ms. Elser no notice, way to opt out, way to obtain the records of her movements that Flock tracked, or way to have her records deleted.

265. The seclusion Flock invaded is the seclusion of a person's private affairs and concerns: where she goes, when she goes there, how often she returns, and what the sum of those movements discloses about her work, her health, her faith, her politics, and the people she sees. Colorado law protects that interest whether or not any individual trip happened to occur on a public street.

266. As a direct and proximate result of Flock's conduct, Ms. Elser suffered the injuries, damages, and losses described above.

267. Flock's conduct was attended by circumstances of fraud, malice, or willful and wanton conduct, entitling Ms. Elser to exemplary damages under Colorado law.

**SIXTH CLAIM FOR RELIEF[4]**
**Colorado Common Law**
**Negligence, Negligent Undertaking, Negligent Design, and Failure to Warn**
*Plaintiff, Individually and on Behalf of the Class, Against Defendant Flock*

268. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

269. Ms. Elser brings this claim individually and on behalf of the Class.

---

[4] Plaintiff brings this claim in good faith for the express purpose of extending and/or modifying existing precedent.

270. Flock owed a duty of reasonable care to Ms. Elser and to every other person whose movements its cameras record and whose data its system discloses to police. That duty arises from several independent sources.

271. First, Flock undertook, for consideration, to render services to Columbine Valley and Bow Mar that Flock knew were necessary for the protection of third persons, including Ms. Elser. Flock undertook to design and operate the system that recorded and disclosed her movements; to configure CVPD's account, users, permissions, and sharing settings; to train CVPD's officers, including Defendants Cottrell and Milliman, in the use and limits of the system; and to safeguard the data through a documented-reason requirement and an audit trail. Having undertaken those services, Flock was obligated to perform them with reasonable care. Flock's failure to exercise reasonable care increased the risk of harm to Ms. Elser, and Columbine Valley and Bow Mar relied on Flock's undertaking in lieu of adopting safeguards of their own.

272. Second, Flock designed, manufactured, and operates a product that Flock knew police officers would use to identify, investigate, and charge members of the public with crimes. Flock knew that its system produced hits that are never, by themselves, probable cause. Flock knew, from its own audit logs and from years of public reporting, that officers treated Flock hits as proof of guilt, searched the historical movements of people for no legitimate reason, and had wrongly stopped and accused innocent people based solely on data produced by Flock's system. Flock nonetheless designed its system to permit any user to retrieve the full historical movements of any vehicle with no warrant, no case number, no supervisory approval, and no technical safeguard of any kind, and it designed its user interface and marketing to present those results as objective proof of guilt. A reasonably careful designer of such a system would have incorporated

safeguards, including a mandatory documented justification, supervisory approval, or a warrant requirement, before permitting a retrospective search of a person's movements, and would have presented search results with prominent warnings about their evidentiary limits.

273. Third, Flock had a duty to warn and adequately instruct the users of its system, including Defendants Cottrell and Milliman, that a Flock hit establishes only that a vehicle bearing a particular plate passed a particular camera at a particular time; that it does not identify the driver or occupants; that it is not probable cause; and that it must be corroborated before it is used to accuse or charge any person.

274. Flock breached each of those duties.

275. Flock could have implemented numerous safeguards that would have prevented the violation of Ms. Elser's rights but chose not to do so. For example, Flock built a case code requirement into its system but left it optional. Flock sold the product to Columbine Valley and Bow Mar without those safeguards.

276. Flock's design was defective in specific, identifiable respects. It accepts any text an officer types as the reason for a search, including no text at all. It does not require a warrant or supervisory approval. And it imposes no limit on how far back a single query may reach.

277. Safeguards against each of those defects were technically feasible, commercially practical, and available to Flock before it sold anything to Columbine Valley. Flock has since adopted several of them. It adopted them only after Defendant Milliman charged Ms. Elser, after officers across the country were arrested for using its system, and after Congress, state auditors, and the press had spent years documenting the obvious flaws in Flock's design.

278. It was foreseeable to Flock that its breaches would cause an officer to treat a Flock hit as conclusive evidence of an innocent person's guilt and to charge that person with a crime.

279. Flock breached those duties as to every member of the Class.

280. As a direct and proximate result of Flock's negligence, Ms. Elser and the Class members suffered the injuries, damages, and losses described above.

281. Flock's conduct was attended by circumstances of willful and wanton conduct, entitling Ms. Elser to exemplary damages under Colorado law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Chrisanna Elser respectfully requests that this Court enter judgment in her favor and against Defendants, and award her and the Class all relief allowed by law, including but not limited to the following:

a. All appropriate relief at law and equity;

b. Declaratory relief, including, but not limited to:

    1. A declaration that Defendants' warrantless collection, cataloging, retention, sharing, and searching of the record of Ms. Elser's movements through Flock's ALPR cameras violate the Fourth Amendment to the United States Constitution and Article II, Section 7 of the Colorado Constitution;

    2. A declaration that Defendant Milliman's warrantless search of the historical movements of Ms. Elser's vehicle violated the Fourth Amendment to the United States Constitution and Article II, Section 7 of the Colorado Constitution;

    3. A declaration that Flock's collection, cataloging, retention, and disclosure of the movements of the members of the Class, without a warrant and without their consent, are an unreasonable intrusion upon their seclusion;

c. Injunctive relief, including, but not limited to:

    1. A permanent injunction prohibiting Defendants Columbine Valley, Bow Mar, Cottrell, and Flock, and their officers, agents, employees, and successors, from searching the historical location data of any vehicle captured by Flock's cameras

in Columbine Valley or Bow Mar without a warrant issued by a neutral magistrate upon probable cause, or a recognized exception to the warrant requirement;

2. A permanent injunction prohibiting Defendants Columbine Valley, Bow Mar, Cottrell, and Flock from retaining the location data of vehicles captured by Flock's cameras in Columbine Valley or Bow Mar that are not the subject of an open criminal investigation supported by a documented case number, and from sharing that data with any other agency or entity without a warrant;

3. An order requiring Defendants Columbine Valley, Bow Mar, Cottrell, and Flock to permanently delete all data in their possession, custody, or control reflecting the movements of Ms. Elser's vehicle;

4. An order requiring Defendants Columbine Valley, Bow Mar, and Cottrell to adopt written policies governing officers' access to and use of ALPR data, including a warrant requirement for searches, mandatory case-number documentation, supervisory approval, regular audits, and training on the evidentiary limits of ALPR data;

5. A permanent injunction requiring Defendant Flock to stop collecting, cataloging, retaining, and disclosing the location data of the members of the Class without a warrant, and requiring Flock to build into its system, for every Colorado agency to which it sells that system, a mandatory warrant requirement for retrospective searches of a person's historical movements, mandatory case-number documentation, mandatory supervisory approval, and mandatory auditing;

d. Actual, economic damages as established at trial;

e. Compensatory damages, including but not limited to damages for emotional distress, humiliation, loss of reputation, loss of enjoyment of life, physical injury, and economic loss, in an amount to be determined at trial;

f. Punitive damages against Defendants in amounts to be determined at trial;

g. Pre-judgment and post-judgment interest at the highest lawful rate;

h. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988 and C.R.S. § 13-21-131(3); and

i. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 5th day of October 2026.

NEWMAN | MCNULTY, LLC

*s/ Andy McNulty*
Mari Newman
Andy McNulty
Madeline Leibin
1490 N. Lafayette Street, Suite 304
Denver, CO 80218
(720) 850-5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com
madeline@newman-mcnulty.com

ATTORNEYS FOR PLAINTIFF